# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LEE WILLIAMS, *individually and in his representative capacitiy*,<br><br>    Plaintiff,<br><br>v.<br><br>TECH MAHINDRA (AMERICAS), Inc.,<br><br>    Defendant. | No. 20-4684<br><br>**CLASS ACTION** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Jonathan Rudnick, Esq.
LAW OFFICES OF JONATHAN RUDNICK, LLC
788 Shrewsbury Avenue
Tinton Falls, NJ 07724
Telephone: (732) 842-2070
Facsimile: (732) 879-0213
jonr@jonrudlaw.com; dkotchen@kotchen.com

**Attorney for Plaintiffs and Putative Class**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Lee Williams brings this action on behalf of himself and a class of similarly situated individuals to remedy pervasive, ongoing race discrimination by Defendant Tech Mahindra (Americas), Inc.

### LOCAL CIVIL RULE 10.1 STATEMENT

1. The mailing addresses of the parties to this action are:

   Lee Williams
   2401 Stirling Circle.  Apt 312
   Dunedin, FL 34698

   Tech Mahindra (Americas), Inc.
   200B Meadowlands Parkway
   Secaucus, NJ 07094

### NATURE OF THE ACTION

2. Tech Mahindra, Ltd. is an information technology ("IT") company located in India. Defendant Tech Mahindra (Americas), Inc. (hereinafter "TMA") is Tech Mahindra, Ltd.'s wholly owned subsidiary. TMA provides IT outsourcing and consulting services to clients within the United States.  TMA employs approximately 5,100 employees in the United States. While roughly 1-2% of the United States population, and roughly 12% of the relevant labor market, is South Asian and Indian, approximately 90% (or more) of TMA's United States-based workforce is South Asian and Indian. As discussed further below, this grossly disproportionate workforce is the result of TMA's intentional pattern or practice of employment discrimination against individuals who

are not South Asian, including discrimination in hiring, staffing, promotion, and termination decisions.[1]

3. Tech Mahindra's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. Plaintiff seeks, on his own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress TMA's pervasive pattern or practice of discrimination.

## THE PARTIES

4. Plaintiff Lee Williams was born in the United States, and is of Caucasian Race and American national origin. He resides in Florida. Mr. Williams was employed by TMA in Columbus, Ohio and lived in Ohio at all times discussed below. Mr. Williams is a member of a protected class as recognized by 42 U.S.C. § 1981.

5. TMA is a company incorporated in New Jersey with a principal business address of 36 Pittenger Pond Rd., Freehold, NJ, 07728. TMA is registered to do business in New Jersey and maintains offices in Bedminster, Secaucus, and South Plainfield.

## JURISDICTION & VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1981(a).

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of

---

[1] As used herein, "South Asian race" refers to individuals who trace their ancestry to the Indian sub-continent.

interest and costs, and involves at least one class member who is a citizen of a state and is brought against a corporation that is a citizen of a different state.

8. This Court has personal jurisdiction over TMA because it is incorporated in New Jersey and maintains a principal business address here.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)-(c) because TMA resides in this District and is subject to the Court's personal jurisdiction in this District.

**TECH MAHINDRA'S BUSINESS MODEL AND DISCRIMINATORY SCHEME**

10. TMA has approximately 25 offices and employs approximately 5,100 individuals in the United States. TMA made almost $1 billion in revenue in the past fiscal year, and comparable amounts in prior years.

11. TMA contracts with U.S. companies to provide IT-related services. Once TMA secures a contract with a client, it hires individuals to fill positions to service the client. Both external applicants and existing employees must apply and interview for these positions. Once a position servicing a client comes to an end (or if an employee is removed from a position), employees are placed in a non-productive status referred to as being on the bench. Once on the bench, employees must again seek new positions within TMA, going through an application and interview process, just as external applicants must.

12. TMA operates under a general policy of discrimination in favor of South Asians and against individuals who are not South Asian. This general policy of discrimination manifests itself in the same general fashion with respect to TMA's hiring, staffing, promotion, and termination decisions. It consists of at least four inter-related, mutually reinforcing prongs,

pursuant to which applicants and employees outside of HCL's favored class are similarly disadvantaged and harmed.

13. First, TMA engages in a practice of securing H-1B visas (and other visas) for South Asian workers located overseas who will then be used to staff positions in the United States. The federal government annually awards 65,000 H-1B visas (plus an additional 20,000 for individuals with advanced degrees). These visas are awarded on a lottery basis. Given the annual cap on H-1B visas, companies compete to secure visas for prospective visa workers. Each year, companies submit H-1B visa petitions at the beginning of April for visas to be awarded later that year. H-1B visa petitions must identify an actual job at a specific location that the prospective visa worker will fill if awarded a visa.

14. To fulfill its employment preference for South Asians, TMA seeks to maximize the number of visas it receives each year from the federal government. TMA is consistently one of the top ten H-1B visa recipients. TMA submits visa petitions for more positions than actually exist in the U.S. in order to maximize its chances of securing the highest number of available H-1B visas from the lottery process (despite the fact that this practice constitutes visa fraud). In this way, TMA has been able to secure visas for far more individuals than it actually has a present need for. For instance, in FY 2017, TMA obtained 4,931 approved H-1B petitions. In FY 2016, TMA obtained 3,344 approved H-1B petitions. In FY 2015, TMA obtained 2,553 approved H-1B petitions.[2] Given that TMA employs only 5,100 employees in the U.S., TMA could not possibly have positions for each of the thousands of individuals for whom it secures a visa each year. Rather,

---

[2] *See Buy American, Hire American*, U.S. CITIZENSHIP & IMMIGRATION SERVS. (July 5, 2018), https://www.uscis.gov/legal-resources/buyamerican-hire-american-putting-american-workers-first (containing links to the annualized lists).

these individuals are placed in TMA's inventory of visa workers for use on future projects in the U.S.

16. All, or substantially all, of the individuals for whom TMA secures visas are South Asian. TMA gives these individuals preference for open positions in the U.S. (over locally hired non-South Asian employees and external applicants). Similarly, non-South Asian individuals are often displaced from their current positions in favor of South Asian visa-ready individuals.

16. Second, TMA gives preference to South Asian applicants located in the U.S. over non-South Asian applicants. As a result, on information and belief, TMA hires a disproportionately high percentage of South Asians within the United States that far exceeds the proportion of those individuals in the relevant labor market. These locally hired South Asian employees are then given preference for open positions in the U.S. (over locally hired non-South Asian employees).

17. Third, TMA gives preference to South Asians over non-South Asians in making promotion decisions. This results in diminished career prospects and lower pay for non-South Asian individuals, among other harms. The vast majority (if not all) of TMA's managerial and supervisory positions in the U.S. are filled by South Asian individuals.

18. Fourth, because of its discriminatory preference for South Asians, TMA terminates non-South Asians at disproportionately high rates, compared to South Asians. Additionally, because of TMA's preference for filling positions with South Asians, non-South Asians are disproportionately relegated to the bench and disproportionately unable to locate new assignments. On information and belief, individuals who remain on the bench for too long are terminated.

19. TMA's U.S. workforce reflects the result of its discriminatory scheme. While only about 12% of the relevant labor market (the IT industry) is South Asian, approximately 90% (or

more) of TMA's United States-based workforce is South Asian, as is, the vast majority (if not all) of its managerial and supervisory-level staff.

## PLAINTIFF LEE WILLIAMS' EXPERIENCES

20. Mr. Williams is a highly skilled senior technology sales executive with over twenty years of professional experience. He holds a B.S. in Business Management from Indiana Wesleyan University. Mr. Williams specializes in new logo acquisition, account management, and team leadership, and sells both technology and services to clients. He has held a variety of director and vice president-level sales roles throughout his career.

21. Mr. Williams was hired by TMA for a Regional Manager / Senior Director of Business Development sales role based out of Columbus, Ohio in May 2014. He started work for the company on June 2, 2014. In this position, Mr. Williams was a "hunter," responsible for generating business and sales from new banking clients (*i.e.*, clients with whom TMA had no prior business relationship or sales) in the Midwest and developing relationships with these new accounts. During the interview process, TMA asked Mr. Williams whether he had any contacts with the approximately ten banking clients he would be assigned to in the Midwest. Mr. Williams confirmed that he did have contacts within these accounts from having called on them during his career. The company also informed Mr. Williams during the interview process that it had a good relationship with the potential clients in his territory and that there was an existing pipeline of future sales that he could utilize to generate new business and sales with these accounts.

22. Of the approximately eight employees in Mr. Williams' new hunter fields sales group, Mr. Williams was one of only two non-South Asians. He reported to Manish Sharma, Vice

President, who was based out of New Jersey. Like the vast majority of TMA's managerial and supervisory staff, Mr. Sharma is of South Asian race.

23.     Shortly after joining TMA, the company asked Mr. Williams to enter his professional banking contacts into TMA's Salesforce CRM system, which Mr. Williams had acquired through his over twenty years of sales experience. Mr. Williams complied with this request, and continued to update his contacts in the system throughout his tenure with TMA.

24.     When Mr. Williams began calling on the banking clients shortly after joining TMA, he quickly learned that TMA's representation that it had a good working relationship with the various accounts in his territory and a pipeline of sales he could build from was false. In fact, a number of accounts informed Mr. Williams that TMA had previously called on them, and that they in fact had a poor relationship with TMA. As a result, it often took Mr. Williams months to set up meetings with these accounts and deals were lost to competitors due to TMA's poor history with the accounts. While Mr. Williams reported this issue to his manager, Mr. Sharma, and asked for assistance in overcoming the problems with the accounts he inherited, Mr. Williams' requests for help went unanswered.

25.     Mr. Williams attended three regional meetings for TMA in New Jersey and Georgia during his tenure with the company. These meetings were typically attended by project managers, subject matter experts, and salespersons. Of the approximately 90 to 100 attendees at these meetings, the vast majority of individuals (over 90%) were of South Asian. Hindi was often spoken socially at these meetings to the exclusion of Mr. Williams, a native English speaker.

26.     Despite these challenges, Mr. Williams performed well in his sales role. He worked diligently to improve TMA's relationship with the Midwest banking accounts and successfully identified opportunities for future sales that he was pursuing at the time of his termination, which

included, for example, four opportunities with PNC totaling over $3 million in potential sales revenue. In February 2015, Mr. Williams was provided with a small raise by TMA for his efforts. However, because TMA's pattern or practice of discrimination, it never promoted Mr. Williams.

27. In June 2015, Mr. Williams' manager, Mr. Sharma, informed him that he was not meeting his sales goals, and that he would be put on a Performance Improvement Plan ("PIP") effective June 15, 2015. Under the 60-day PIP, TMA set unreasonable revenue goals for Mr. Williams that were unattainable given the company's poor working relationship with the accounts in Mr. Williams' territory. The assignment of Mr. Williams to a PIP was pretextual, and was designed to set Mr. Williams up to fail so that TMA could terminate his employment.

28. TMA terminated Mr. Williams on August 19, 2015. Curiously, on September 7, 2015, Mr. Williams received a letter from Joji Litto, Group Manager – Human Resources at TMA, noting that his "resignation ha[d] been accepted" and that he was "relieved from the services of [TMA] effective … 19 August 2015." Mr. Williams did not resign from TMA; rather, he was terminated because of TMA's pattern or practice of discrimination.

## CLASS ACTION ALLEGATIONS

29. Plaintiff brings this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for TMA's systematic pattern or practice of discriminatory employment practices against individuals who are not of South Asian race. This action is brought on behalf of the following class:

> All persons who are not of South Asian race who: (1) sought a position with or within TMA and were not selected, (2) who were employed by TMA but not promoted, and/or (3) were employed by TMA and involuntarily terminated.

30. Members of the class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown

to Plaintiff, it is believed to be in the thousands. Furthermore, members of the class are readily identifiable from information and records in TMA's possession.

31. There are numerous questions of law and fact common to the class. Among the common questions of law or fact are: (a) whether TMA has engaged in a pattern or practice of discrimination against non-South Asian individuals in its hiring, staffing, promotion, and termination decisions; (b) whether TMA has violated 42 U.S.C. § 1981; (c) whether equitable and injunctive relief is warranted for the class; and (d) whether compensatory and/or punitive damages are warranted for the class.

32. Plaintiff's claims are typical of the class. All members of the class were damaged by the same discriminatory policies and practices, *i.e.*, they were denied the opportunity to fairly compete for and obtain employment with TMA, were denied positions and promotions within the company, and/or were terminated by the company.

33. Plaintiff will fairly and adequately protect the interest of other class members because he has no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in class litigation to represent them and the class.

34. Because of TMA's actions, which were taken intentionally and/or with reckless disregard for the federally protected rights of Plaintiff and the class, Plaintiff and the class have suffered substantial harm for which punitive damages is warranted.

35. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because TMA has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Plaintiff and the class.

Members of the class are entitled to declaratory and injunctive relief to end TMA's discriminatory policies and practices.

36. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damage claims of individual class members because the issue of whether TMA engages in a pattern or practice of discrimination against non-South Asian individuals is common and predominates over individual issues of proof. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because, among other reasons, certification will avoid the need for repeated litigation by each individual class member. The instant case will be manageable as a class action. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

37. In the alternative, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiff's claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate TMA discrimination. Certification under this rule is also appropriate to decide whether TMA has adopted a systemic pattern or practice of racial discrimination against non-South Asian individuals. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## CAUSES OF ACTION

### COUNT I
### (Disparate Treatment on the Basis of Race)
### (Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)

38. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

39. Throughout the class liability period, TMA has engaged in a pattern or practice of discriminating against individuals who are not of South Asian race by: (a) knowingly and intentionally favoring South Asian individuals in hiring, staffing, promotion, and termination

decisions, and (b) knowingly and intentionally disfavoring non-South Asian individuals (including Mr. Williams) in hiring, staffing, promotion, and termination decisions.

40. As a result of TMA's intentional discrimination, Plaintiff and members of the class have been denied employment, have been denied positions within TMA, have been denied promotions, and/or have been terminated.

41. TMA's actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a. Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b. Designation of Plaintiff as representative of the class;

c. Designation of Plaintiff's counsel as counsel for the class;

d. A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. § 1981;

e. A permanent injunction against TMA and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f. An order requiring TMA to adopt a valid, non-discriminatory method for hiring, promotion, termination, and other employment decisions;

g. An order requiring TMA to post notices concerning its duty to refrain from discriminating against employees on the basis of race, or retaliating against those who complain of racial discrimination;

h. An award to Plaintiff and the class of all available damages—including (without limitation) punitive damages and compensatory damages—for the harm they suffered as a result of TMA's violations of § 1981;

i. An award to Plaintiff and the class of back-pay, front-pay, reinstatement, and such other equitable relief as the Court deems just and appropriate;

j. An award to Plaintiff and the class of pre- and post-judgment interest at the prevailing rate on damages as a result of TMA's discrimination against them in violation of § 1981;

k. An award of Plaintiff and the class' attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

l. An award to Plaintiff and the class of such other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully demands a trial by jury on all issues properly triable by a jury in this action.

Dated: April 21, 2020

By: /s/Jonathan Rudnick
Jonathan Rudnick, Esq.
LAW OFFICES OF JONATHAN RUDNICK, LLC
788 Shrewsbury Avenue
Tinton Falls, NJ 07724
Telephone: (732) 842-2070
Facsimile: (732) 879-0213
jonr@jonrudlaw.com

Daniel Kotchen (*pro hac vice* forthcoming)
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
(202) 471-1995
(202) 280-1128 (Fax)
dkotchen@kotchen.com

**Attorneys for Plaintiff and Putative Class**